**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **EVOLUTIONARY INTELLIGENCE, INC.** | § § § | |
| **v.** | § § | **No. 6:12cv784** |
| **FACEBOOK, INC.** | § | |

| | | |
|---|---|---|
| **EVOLUTIONARY INTELLIGENCE, INC.** | § § § | |
| **v.** | § § | **No. 6:12cv790** |
| **MILLENNIAL MEDIA, INC.** | § | |

## O R D E R

The above-referenced causes of action were referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. The following motion is before the Court: Emergency Opposed Motion to Disqualify Cooley LLP as Counsel of Record for Facebook, Inc. and Millennial Media, Inc. (Docket Entry #s 50, 35). The Court, having reviewed the relevant briefing, is of the opinion the motion should be **DENIED**.

### I.  BACKGROUND

On October 17, 2012, Evolutionary Intelligence, Inc. ("Plaintiff") filed its original complaints against Facebook, Inc. and Millennial Media, Inc. ("Defendants"), among others. Plaintiff alleges Defendants infringe U.S. Patent Nos. 7,010,536 (the "'536 patent") and 7,702,682 (the "'682 patent") (the "patents-in-suit"). The patents-in-suit generally describe a system and method for processing data using containers, registers, information elements, and gateways.

## II.  MOTION TO DISQUALIFY

Plaintiff moves to disqualify Cooley LLP ("Cooley") as counsel of record for Defendants. According to Plaintiff, Cooley's participation in these cases directly conflicts with its prior representation of entities and persons associated with the patents-in-suit. Specifically, Plaintiff asserts Cooley represented the following: (1) Michael De Angelo, the sole inventor of the patents and the manager and 90% owner of Evolutionary; (2) Pattern Intelligence, Inc., which was wholly owned by Mr. De Angelo until it merged into Evolutionary; and (3) Incandescent, Inc., a company managed and 90% owned by Mr. De Angelo and that owns 100% of Evolutionary.  Plaintiff further asserts Cooley evaluated the scope of the claims of the '536 patent and '682 patent application; gave Mr. De Angelo legal advice regarding the scope of those claims as part of his efforts to seek venture funding; served as Pattern's patent prosecution counsel;  obtained Pattern's entire patent prosecution file from Pattern's other counsel, including privileged and sensitive communications regarding prior art; advised Mr. De Angelo, Pattern, and Incandescent regarding the ownership structure of the patents and applications; and formed Incandescent to hold the asserted patents and develop protected technology.

In its response, Defendants assert Plaintiff was never a client of Cooley, and Cooley did not work on either of the patents at issue in this litigation. Defendants state Cooley does not have confidential information regarding the patents-in-suit.  Defendants further assert Cooley performed only 3.25 hours of general patent work for Pattern over five years ago regarding patents not at issue here.  According to Defendants, Cooley's other work for Pattern and Incandescent comprised corporate work - generic corporate formation, reviewing license agreements, and other matters unrelated to patent work.  Defendants argue Plaintiff does not have standing to bring this motion

because Cooley only represented Pattern and Incandescent, neither of which are parties to this litigation.

### III. DISQUALIFICATION LAW

As disqualification is a procedural matter not unique to patent law, regional circuit law applies. *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 580–81 (Fed. Cir. 1989). "Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Dresser Indus., Inc.*, 972 F.2d 540, 544 (5th Cir. 1992). The attorney disqualification rules are not to be mechanically applied. *See Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1569 (5th. Cir. 1989). "All of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995).

"Although federal courts may adopt state or ABA rules as their ethical standards, whether and how those rules should be applied remains a question of federal law." *Hill v. Hunt*, 2008 WL 4108120 (N.D. Tex. 2008)(unreported). "The ABA Model Rules propound different tests for conflicts of interest arising in concurrent and former representations." *JuxtaComm-Texas Software, LLC v. Axway, Inc., et al.*, 2010 WL 4920909, \*2 (E.D. Tex. 2010)(unreported). ABA Model Rule 1.7 governs concurrent conflicts of interest:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if :
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client

or third person or by a personal interest of the lawyer.

ABA MODEL RULE 1.7(a).

While the Texas Disciplinary Rules of Professional conduct may be relevant to the issue of disqualification, the rules are not dispositive. *Id.*; *see In re Am. Airlines*, 972 F.2d at 610. The Texas Rule requires not only that the clients are directly adverse but also that the matters are substantially related. *See* TEX. R. DISCIPLINARY P. 1.06(b). The Fifth Circuit has shown a preference for the more stringent ABA Model Rule. *In re Dresser*, 972 F.2d at 544. Thus, the Court will apply the Model Rule to the present facts. *See JuxtaComm-Texas*, 2010 WL 4920909 at *2.

For conflicts involving former representations, the movant must prove either that the present and former matters are substantially related or that the former attorney actually possesses relevant confidential information. *In re Am. Airlines*, 972 F.2d at 615; *see also* ABA MODEL RULE 1.09; TEX. R. DISCIPLINARY P. 1.09. Even when matters are not substantially related, a former client may still disqualify former counsel by showing that confidential information was provided to counsel and that the confidential information is relevant to the new matter. *City of El Paso v. Salas-Porras Soule*, 6 F.Supp.2d 616, 624 (W.D. Tex. 1998).

Under the substantially related test, the movant must prove: "1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations." *In re Am. Airlines*, 972 F.2d at 614. In determining if the present and former matters are substantially related, courts have identified three relevant factors: "(1) the factual similarities between the current and former representations, (2) the similarities between the legal question posed, and (3) the nature and extent of the attorney's involvement with the former representation." *Power Mosfet Techs, L.L.C.*

4

*v. Siemens AG*, No. 2:99-CV-168, 2002 U.S. Dist. LEXIS 27557 at *2, (E.D. Tex. 2002).

If the movant establishes that the prior matter is substantially related to the present matter, an irrebuttable presumption arises that relevant confidential information was disclosed during the former representation. *In re Am. Airlines*, 972 F.2d at 614. A second irrebuttable presumption determines confidences obtained by an individual lawyer will be shared with the other members of his firm. *Id.* The movant bears the burden of proving that disqualification is warranted. *In re Am. Airlines, Inc.*, 972 F.2d at 614; *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981).

## IV. RELEVANT FACTS

The inventions covered by the patents-in-suit relate to the efficient processing of containerized information – particularly location and time information. De Angelo Decl. ¶ 2. Evolutionary owns a third patent in this family and a fourth, related patent. *Id*. The sole inventor of all four patents is Michael De Angelo, an entrepreneur who founded four companies—E-Matrix, Inc., Pattern Intelligence, Inc., Incandescent, Inc., and Evolutionary—in an attempt to commercialize his inventions. De Angelo Decl. ¶ 3. Other than Mr. De Angelo and these four companies, no person or entity has ever owned any of the four De Angelo patents. *Id*.

The four companies have always been closely related, with common management and ownership. *Id.* At all times, Mr. De Angelo has served as their sole executive, officer, or manager, and has directed all of their legal work. *Id*. Mr. De Angelo has always been the sole shareholder of E-Matrix and Pattern. *Id*. He also has always owned at least 90% of Incandescent's shares, and there have never been more than 20 shareholders of that corporation. *Id*. According to Mr. De Angelo, because Evolutionary is a wholly owned subsidiary of Incandescent, Mr. De Angelo's controlling

interest of Incandescent extends to Evolutionary. *Id.* "Pattern recently merged into Evolutionary pursuant to Delaware law, transferring all assets, rights, and privileges to Evolutionary." *Id.*

The relevant timeline regarding the merger and subsequent assignment of patents between the companies is as follows:

- June 2009 - Pattern assigned all of its intellectual property to Incandescent.

- 2012 - Evolutionary was formed as a wholly owned subsidiary of Incandescent.

- July 2012 - Incandescent assigned the patents-in-suit to Evolutionary.

- March 18, 2013 - Pattern had to be revived March 18, 2013.[1]

- April 22, 2013 - Pattern merged with Evolutionary.

- April 26, 2013 - Incandescent assigned the '102 patent to Evolutionary.

On August 3, 2005, Mr. De Angelo called Tom Coll, Head of the Business & Technology Practice Group of Cooley's San Diego office, for advice regarding commercialization of the inventions and the possibility of the firm performing legal work for his companies. De Angelo Decl. ¶4. Coll Decl. ¶3. At that time, Pattern's sole asset was the application leading to the '536 patent. *Id.* Mr. De Angelo was actively planning on filing the continuation application that would lead to the '682 patent. *Id.* According to Mr. Coll, Mr. De Angelo informed Mr. Coll that he was planning to raise funds for his company Irizen and that he had a Private Placement Memorandum that had been prepared by another law firm. Coll Decl. ¶3. During their conversation, Mr. De Angelo described the patented technology in high level terms which Mr. Coll considered "amorphous" and did not focus on. *Id.* Given his background and legal practice were focused on corporate structuring

---

[1] According to Ron Metzger, a paralegal at Cooley, Pattern's corporate status was renewed from a void status on March 18, 2013. Metzger Decl. ¶6.

and financing, Mr. Coll focused on those aspects of the conversation. *Id.* Mr. Coll set up an appointment with Mr. De Angelo, who was interested in meeting in person, for Monday, August 8, 2005 to discuss the possibility of Cooley's involvement in restructuring Mr. De Angelo's corporate entities and potential financing opportunities. *Id.*

After the August 3, 2005 telephone conversation between Mr. Coll and Mr. De Angelo, Mr. De Angelo sent Mr. Coll an email attaching a "Irizen Introduction" and "Irizen Internet Communications PPM [Private Placement Memorandum]." Coll Decl. ¶4. Mr. De Angelo stated, "I emailed Mr. Coll a confidential and privileged Irizen Executive Summary disclosing my and Pattern's plans for capitalizing on the inventions that would later become the very patents asserted in this litigation by carving out a niche in the targeted advertising market." De Angelo Decl. ¶6.

However, according to Mr. Coll, the labels "Confidential" and "Proprietary and Confidential" were industry standards and these types of documents are non-confidential and prepared for potential investors outside of any sort of confidential relationship or nondisclosure agreement, leading Mr. Coll to believe they did not contain any proprietary or privileged information. Coll Decl. ¶4.

Before their in-person meeting, on August 8, 2005, Mr. De Angelo emailed Mr. Coll an updated document labeled "Irizen Introduction" which contained the same "Confidential" and "Proprietary and Confidential" labels. Coll Decl. ¶5. Mr. Coll did not feel it contained any proprietary or privileged information. Mr. Coll believed this was a non-confidential "executive summary" that companies prepare to share with potential investors, outside of any sort of confidential relationship or nondisclosure agreement. Coll Decl. ¶5.

On August 8, 2005, Mr. De Angelo and Mr. Coll met in person in San Diego at Cooley's office. De Angelo Decl. ¶ 5; Coll Decl. ¶6. At that meeting, Mr. De Angelo and Mr. Coll discussed

creating a subsidiary or successor of Pattern to be co-owned by Mr. De Angelo and Pattern. De Angelo Decl. ¶5. Mr. De Angelo had not yet settled on a name of the company, but was considering using the name "Irizen Internet Technologies." De Angelo Decl. ¶5. Mr. De Angelo intended that Pattern would continue to own the '536 application and become the owner of the '682 application that he was about to file. De Angelo Decl. ¶5. During his discussions with Mr. Coll, Mr. De Angelo stated he disclosed confidential information regarding the prosecution and scope of the '536 patent application and the planned '682 application. De Angelo Decl., ¶ 6. In addition to meeting with Mr. Coll, Mr. De Angelo emailed and called him on a number of occasions. *Id.*

Mr. Coll stated that he and Mr. De Angelo discussed, at a high level, the technology that Mr. De Angelo's company was developing. Coll Decl. ¶6. Mr. Coll did not recall Mr. De Angelo discussing the patents in detail or discussing patent prosecution. *Id.* Mr. Coll did recall that Mr. De Angelo mentioned that his current patent attorneys were Fish & Richardson; Mr. De Angelo might have possibly mentioned meeting with some of Cooley's patent attorneys "at some point." Coll Decl. ¶6. They further discussed the possibility of Irizen's engaging Cooley to perform corporate restructuring by drafting incorporation and assignment documents. " Coll Decl. ¶6.

According to Mr. Coll, Mr. De Angelo was interested in raising capital for Irizen from venture capital firms and asked him to reach out to his contact at a venture capital firm and share information about Mr. De Angelo's company. Coll Decl. ¶7. Mr. De Angelo did not request or require Mr. Coll's contact at the venture capital firm to enter into any confidentiality or nondisclosure agreement. Coll Decl. ¶7. After the August 8, 2005 in-person meeting, Mr. Coll emailed the updated "Irizen Introduction" document, along with a summary in a cover email based on information that was "cut and pasted" from the PPM to his venture capital contact at Avalon

8

Ventures, as requested by Mr. De Angelo. Coll Decl. ¶8.

On Tuesday, August 9, 2005, Mr. De Angelo emailed Mr. Coll an updated document titled "Irizen Mobile Marketing" with express, written permission to send the attached document to Mr. Coll's contact at Avalon. Mr. De Angelo wrote the document was "for [my] discussion with Avalon, or [to] send [to] them under [my] own cover." Coll Decl. ¶9.

On Wednesday, August 10, 2005, Mr. De Angelo sent Mr. Coll another email attaching a "new, more comprehensible executive summary," titled "IR Executive Summary." Coll Decl. ¶10. De Angelo Decl. ¶6. According to Mr. Coll, this document was labeled "Proprietary and Confidential," as the other documents had been. Despite the label, Mr. Coll asserts Mr. De Angelo gave him express, written permission to forward this document to his venture capital contacts, indicating this Executive Summary was "for use of [me] and [my] team, or it can be sent to venture capital." Coll Decl. ¶10.

Mr. Coll informed Mr. De Angelo that he had forwarded the "Irizen Introduction" document to his contact at Avalon Ventures and asked Mr. De Angelo to let him know when Cooley could begin preparing incorporation, assignment, and employment documents relating to Irizen. Coll Decl. ¶11. Mr. Coll stated, "[a]t this point, I was still hoping that I would be able to engage Irizen as a client of the firm." Coll Decl. ¶11.

On Thursday, August 11, 2005, Mr. De Angelo sent an email to Mr. Coll asking him "to put a hold on Irizen activities." Mr. De Angelo's email stated he would be in touch with further information. Coll Decl. ¶12. Mr. Coll did not "get the sense that he would be in touch." Mr. Coll felt Mr. De Angelo's only interest in Cooley was their ability to provide access to financing; Mr. Coll no longer believed that Irizen was interested in engaging Cooley's services or developing an

attorney-client relationship. *Id.*

According to Mr. Coll, he did not believe that Cooley entered into an attorney-client relationship with Mr. De Angelo or Irizen; he did not believe that Mr. De Angelo or Irizen shared any proprietary information or information regarding Mr. De Angelo's technology in greater detail than what was contained in the "Introduction," "Executive Summary," or Private Placement Memorandum documents. Coll Decl. ¶13. Mr. Coll did not give Mr. De Angelo or Irizen any legal advice besides a high level structure that might accommodate a corporate-subsidiary relationship if Irizen chose to engage Cooley. Coll Decl. ¶¶13-14. According to Mr. Coll, he did not obtain nearly enough information to be in a position to provide legal advice regarding corporate structuring alternatives that may have been available. Coll Decl. ¶14.

Mr. Coll never performed legal services for Mr. De Angelo or Irizen; he never billed either for any of his time; and he never sent any invoices to Mr. De Angelo or Irizen. Mr. Coll billed all of his time dealing with Mr. De Angelo and Irizen to "business promotion." Coll Decl. ¶15.

Mr. Coll understood that Irizen was a potential client of the firm and at one point hoped to develop the relationship into one of attorney-client, but they did not progress to that level. Coll Decl. ¶16.Mr. Coll's discussions with Mr. De Angelo never progressed to the point of discussing costs or Cooley's rates. Mr. Coll never sent Mr. De Angelo a proposed engagement letter. Coll Decl. ¶16.

In November 2005, Mr. De Angelo filed the application for the '682 patent. He assigned the patent to Pattern Intelligence, Inc. on February 13, 2006. De Angelo Decl. ¶7. On March 7, 2006, the Patent Office issued the '536 patent. De Angelo Decl. ¶8.

In February 2007, Mr. De Angelo approached Cooley for further advice on corporate structuring, licensing, and patent prosecution for Pattern. De Angelo Decl. ¶9. According to Jodie

M. Bourdet, a partner with Cooley, she first spoke with Mr. De Angelo on February 23, 2007. Bourdet Decl. ¶¶1-2. Mr. De Angelo contacted Ms. Bourdet to schedule a meeting to introduce her to his companies Pattern Intelligence, Inc. and Impulse Media, Inc. Bourdet Decl. ¶2. Mr. De Angelo hoped to be introduced to a patent attorney at the February 27, 2007 meeting. However, Ms. Bourdet was informed the day before the meeting that the patent partner, William Galliani, was unavailable. Bourdet Decl. ¶2.

On Tuesday, February 27, 2007, following their first meeting, Mr. De Angelo sent Ms. Bourdet an email with the publicly available and already issued '546 patent and a short Executive Summary, which contained no information Mr. De Angelo intended to keep confidential, for Pattern Intelligence. Bourdet Decl. ¶¶3-4. According to Ms. Bourdet, the Executive Summary that Mr. De Angelo sent her was similar to introductory written materials for start-up companies: short, high-level, and vague. Bourdet Decl. ¶4. The Executive Summary was a document proposed to be distributed to potential investors and strategic partners, and it was intended to be shared with parties who are not requested to sign nondisclosure agreements or otherwise agree to keep the information confidential. Bourdet Decl. ¶4. Ms. Bourdet responded to Mr. De Angelo's email, advising that Cooley could possibly represent Pattern Intelligence for patent prosecution work and Impulse Mobile for corporate and financing work. Bourdet Decl. ¶5.

On Wednesday, February 28, 2007, Mr. De Angelo informed Ms. Bourdet that he was agreeable to Cooley's representation of Pattern and Impulse Mobile. Bourdet Decl. ¶6. Cooley sent Mr. De Angelo a written engagement agreement for Patten, which provided as follows:

> Because we represent a large number of clients in a wide variety of legal matters, it is possible that we will be asked to represent a client whose interests are actually or potentially adverse to the Company's interests, including, without limitation, in a

business licensing, financing or restructuring transaction, or in bankruptcy or insolvency proceedings or litigation. In any of these circumstances, we agree that we will not undertake any such representation if the other representation is related to a matter in which we currently represent the Company.

De Angelo Decl. ¶9. According to Mr. De Angelo, Cooley agreed that even in unrelated matters, it would not represent an adverse company without Pattern's consent if the unrelated representation would "implicate any confidential information we have received from the Company." De Angelo Decl. ¶9.

According to Ms. Bourdet, Cooley made it clear to Mr. De Angelo that it required signed engagement letters and internal firm approval to engage with any new client. Bourdet ¶7. To that end, on Thursday, March 1, 2007, Ms. Bourdet sent proposed engagement letters to Mr. De Angelo for Pattern and Impulse Mobile. Bourdet Decl. ¶7. Ms. Bourdet informed Mr. De Angelo in writing that Cooley did not and would not represent him personally. Bourdet Decl. ¶8. For example, on the first page of the proposed engagement letter dated February 28, 2007, Ms. Bourdet informed Mr. De Angelo that "we have been engaged to assist Pattern Intelligence, Inc. (the 'Company') in connection with its patent matters. As discussed, we are going to represent only the Company and will not be able to represent the founder's or other owner's interest (including your own interest as a founder of the Company) separately." Bourdet Decl. ¶8. The letter also stated, "[a]t this time, our engagement is limited to the matters described in the letter. . . ." Bourdet Decl. ¶8.

The initial proposed engagement letter for Pattern provided for a retainer of $5,000 before any services would be rendered. Bourdet Decl. ¶9. According to Ms. Bourdet, Mr. De Angelo declined to provide a retainer and never executed this engagement letter on behalf of Pattern. The initial proposed engagement letter for Impulse Media also provided for a $5,000 retainer. Bourdet Decl. ¶10. Again, Mr. De Angelo declined to provide a retainer and never executed the engagement

12

letter on behalf of Impulse Mobile.

On Thursday, March 1, 2007, Mr. De Angelo informed Ms. Bourdet that he did not expect any patent or trademark work for the companies during the next ninety days and that Impulse Mobile would need minimal services over the next ninety days. Bourdet Decl. ¶¶9-10.

On Tuesday, March 6, 2007, Ms. Bourdet informed Mr. De Angelo that if the scope of the work to be done was as limited as he had represented, Cooley would initially forgo the retainer. Bourdet Decl. ¶11. Ms Bourdet's legal secretary sent Mr. De Angelo two revised engagement agreements for Pattern and Impulse Mobile that were the same as those originally sent to him, except no retainer was required at that time based on the scope of the work Mr. De Angelo had outlined; Cooley reserved the ability to request retainers in the future. Bourdet Decl. ¶12-13.

Mr. De Angelo executed and delivered the revised engagement letters on March 7, 2007. Bourdet Decl. ¶14. Bill Galliani, who is now Co-Chair of Cooley's Patent Counseling and Prosecution group, served as Pattern's lead patent counsel, and Ms. Bourdet served as Pattern's general and corporate counsel. De Angelo Decl. ¶10.

Following the execution of the engagement agreements for Pattern and Impulse Mobile, Mr. De Angelo asked Cooley to incorporate an entity to be known as Incandescent, Inc.  Bourdet Decl. ¶15.  During 2007 and 2008, Cooly briefly assisted Incandescent with corporate work, filing articles of incorporation, reviewing licensing agreements, and providing advice acquiring financing. Bourdet Decl. ¶16.; De Angelo Decl. ¶11. Incandescent was the company Mr. De Angelo had previously intended to call Irizen. De Angelo Decl. ¶11.Ms. Bourdet advised Mr. De Angelo regarding the proper structure of the patent licensing arrangement between Pattern as a patent holding company and Incandescent as an operating company. De Angelo Decl. ¶11.

Around March 7, 2007, Mr. De Angelo sent Ms. Bourdet, who later forwarded it to Mr. Galliani, a "confidential and proprietary" Executive Summary that laid out Incandescent's business plan; it contained numerous statements about the '536 patent and the '682 patent application as well as Incandescent's plans with that property, including target licensees and the scope of the patent monopoly held by Pattern and Incandescent. De Angelo Decl. ¶12. Mr. Galliani reviewed the Executive Summary for Incandescent and identified a patent and patent applications said to be owned by the company and provided a broad description of the subject matter disclosed within the patent and patent applications. Galliani Decl. ¶3. Mr. Galliani discovered that some of the technology claimed to be patented in the Executive Summary was only disclosed in patent applications. Galliani Decl. ¶3.

On March 16, 2007, Mr. Galliani spoke with Mr. De Angelo on the telephone about the Executive Summary. Galliani Decl. ¶4; De Angelo Decl. ¶13. According to Mr. Galliani, his review of the pending patents and patent applications in connection with the Executive Summary was cursory and high level, and any advice he provided to Pattern or Incandescent regarding the Executive Summary was similarly cursory and high level. Galliani Decl. ¶4. Mr. Galliani's advice would bear no substantial relationship to infringement, invalidity or other issues in a patent infringement litigation involving the '536 or '682 patents. Galliani Decl. ¶4.

According to Mr. De Angelo, his privileged conversation with Mr. Galliani involved the '536 patent and the '682 patent application and in particular involved subject matter directly relevant to the issues of infringement and validity in this litigation. De Angelo Decl. ¶13. Mr. Galliani also added a bold-print detailed notice to the Executive Summary that the document was "confidential and proprietary to the company" and solely for "confidential use." De Angelo Decl. ¶13.

14

Mr. Galliani billed 1 hour of time addressing Incandescent's Executive Summary. Galliani Decl. ¶5. He did no further work for Incandescent. Galliani Decl. ¶5.

On March 19, 2007, Mr. De Angelo sent Steve Jurvetson, a potential investor not affiliated with Cooley, an email introducing Incandescent and its technology. Bourdet Decl. ¶17. Ms. Bourdet had provided Mr. De Angelo with Mr. Jurvetson's contact information. Mr. De Angelo copied Ms. Bourdet on the email. Bourdet Decl. ¶17. Mr. De Angelo attached the Incandescent Executive Summary without requesting that it be treated as confidential. Bourdet Decl. ¶17.

From March through June 2007, Cooley prepared basic paperwork to incorporate Incandescent in Delaware and issue stock; engaged in high level review of the Executive Summary previously provided, which Mr. De Angelo revised to refer to Incandescent instead of Pattern Intelligence; and performed high level review of proposed license agreement and another document for Incandescent. Bourdet Decl. ¶18-19.

On Tuesday, June 12, 2007, Ms. Bourdet unexpectedly received a box of patent files Mr. De Angelo sent from his previous patent attorneys at Fish & Richardson P.C. Bourdet Decl. ¶20; De Angelo Decl. ¶14. The file included (1) non-public prosecution files for the application leading to the '682 patent; (2) attorney work product such as a draft of the application leading to the '102 patent; (3) privileged correspondence from Mr. De Angelo to former attorneys at Fish & Richardson detailing his interpretation of the '536 claims and its distinctions over prior art; and (4) an August 15, 2005 email discussion of potential prior art between Mr. De Angelo and a Fish & Richardson attorney. De Angelo Decl. ¶14. According to Mr. De Angelo, Cooley docketed Pattern's entire portfolio and began monitoring Pattern's deadlines, including those for the '682 application. De Angelo Decl. ¶14.

15

Upon receiving the files, Ms. Bourdet reminded Mr. De Angelo by email that Cooley could not represent Pattern Intelligence in patent matters without a retainer. Bourdet Decl. ¶21. Although Cooley had not agreed to take responsibility for any patent matters, Ms. Bourdet asked Mr. Galliani to determine whether there were any impending deadlines. Bourdet Decl. ¶22.

At the request of Ms. Bourdet, Mr. Galliani performed a limited analysis of the patents for an inquiry into deadlines for submission to the Patent and Trademark Office. Bourdet Decl. ¶22. Galliani Decl. ¶7. Mr. Galliani discovered that Pattern Intelligence had impending patent application deadlines, including one for converting the provisional application that led to the '102 patent into a non-provisional application. Galliani Decl. ¶7. Mr. Galliani emailed Mr. De Angelo and discussed the preparation of the application for the '102 patent but Mr. Galliani did not provide advice regarding the scope of the '102 application. Galliani Decl. ¶8; De Angelo Decl. ¶15. In total, Mr. Galliani billed 1 hour of time determining the existing deadlines and responding to Mr. De Angelo's question. Galliani Decl. ¶9. Mr. Galliani does not recall seeing any correspondence between Mr. De Angelo and prior patent counsel Fish and Richardson during his cursory review of the files to identify pending deadlines. Galliani Decl. ¶17.

On June 13, 2007, Ms. Bourdet informed Mr. De Angelo that Mr. Galliani had identified certain upcoming deadlines but that Cooley could not do any patent work for Mr. De Angelo unless he paid for the expenses of that work. Bourdet Decl. ¶23.  On July 12, 2007, Ms. Bourdet informed Mr. De Angelo of the anticipated fees and Cooley's required retainer for certain further patent work. Bourdet Decl. ¶24.

On July 23, 2007, Ms. Bourdet emailed Mr. De Angelo that "[n]either Bill [Mr. Galliani] nor I has heard anything from you regarding the $4,000 retainer for the very near-term patent work . .

16

. . We need to receive the check for the retainer by this Thursday, July 26, if we are to be able to complete the work for the August deadline. . . . If you have chosen to work with other counsel, please let us know so we can make arrangements to transfer the files." Bourdet Decl. ¶25.

On August 3, 2007, to comply with "the client's desire to minimize costs," and after considering problems with invoice payment apparently caused by Pattern's lack of funding, Mr. Galliani filed a non-provisional application leading up to the '102 patent. Galliani Decl. ¶10; De Angelo Decl. ¶15. Mr. Galliani reused the disclosures, figures, and claims from the previously filed provisional patent applications. Galliani Decl. ¶10. Mr. Galliani billed three-quarters hour for time spent reviewing the provisional application, communicating this with Mr. De Angelo, and preparing and filing the '102 patent application. Galliani Decl. ¶11.

On October 13, 2007, Cooley prepared and filed the assignment of the '102 application from him to Pattern. De Angelo Decl. ¶15. According to Mr. Galliani, he filed formal figures, a declaration, and an assignment associated with the '102 patent application in the Patent and Trademark Office in November of 2007, billing 0.25 hours. This was the full extent of his work on the '102 patent application. Galliani Decl. ¶11. Mr. Galliani was the attorney of record before the Patent and Trademark Office ("PTO") pertaining to the '102 application. *Id.* ¶14. Mr. Galliani was never officially made attorney of record before the PTO for any other intellectual property held by Pattern Intelligence or Incandescent and was never asked to perform any work directed at the '536 or '682 patent. Galliani Decl. ¶¶15-16.

To the best of her knowledge, the last corporate work Cooley performed for Incandescent took place in October 2007. Bourdet Decl. ¶26. In total, Cooley billed Incandescent and Pattern for 26.85 hours of attorney time on both corporate and patent matters. Only 3.25 hours of that total were

billed by Cooley attorneys to patent-prosecution work. Bourdet Decl. ¶27.

On February 6, 2008, Ms. Bourdet informed Mr. De Angelo that his companies' long-overdue fees remained unpaid. Bourdet Decl. ¶28. Due to non-payment of our invoices and general difficulty with communications with Mr. De Angelo, Cooley determined to formally end the engagement. On April 28, 2008, Ms. Bourdet mailed disengagement letters to both Pattern Intelligence and Incandescent. Bourdet Decl. ¶29.

On April 30, 2008, Ms. Bourdet again informed Pattern and Incandescent by email that Cooley would no longer represent them due to non-payment of fees. Bourdet Decl. ¶30. On May 7, 2008, Ms. Bourdet directed that patent files be returned to Pattern. Those files were returned to Pattern, and Cooley did not retain a copy. Bourdet Decl. ¶31.

On May 8, 2008, Mr. Galliani filed a notice of withdrawal as attorney of record before the PTO for the '102 application. Galliani Decl. ¶15; De Angelo Decl. ¶16. While doing so, he mistakenly filed a similar notice for the '682 patent. Galliani Decl. ¶15. The PTO rejected this notice because Mr. Galliani never appeared in the proceeding. Galliani Decl. ¶15.

Although Mr. Galliani did not perform any substantive work on the '536 patent or '682 patent, Cooley's normal practice is to docket incoming patent applications from new clients in order to ensure that all deadlines associated with the patent application are known. Galliani Decl. ¶19. Cooley charges a fixed fee for the docketing of each patent application; the fee is strictly limited to costs associated with docketing and does not indicate any substantive work has been performed by an attorney. Galliani Decl. ¶19. Substantive attention to a patent application is reflected solely in the billing records of each attorney. Galliani Decl. ¶19.

Despite the termination of Cooley's representation, Mr. De Angelo and Pattern continued to

18

act in accordance with the legal advice they had received from Cooley, and Mr. Galliani in particular, as Pattern moved forward with the prosecution of the '682 and '102 patents. De Angelo Decl. ¶17. On June 26, 2009, Pattern assigned all of its intellectual property–including the '536 and '682 patents and the '102 patent application–to Incandescent. De Angelo Decl. ¶17.

In 2012, Mr. De Angelo and Incandescent discovered that a number of companies were infringing the '526 patent and the '682 patent. They formed Evolutionary as a wholly owned subsidiary of Incandescent. De Angelo Decl. ¶18. On July 11, 2012, Incandescent transferred the entire '536 patent family to Evolutionary. *Id.*

On October 17, 2012, Evolutionary filed lawsuits against Facebook and Millennial Media. De Angelo Decl. ¶20. Mr. De Angelo first learned in January 2013 that Cooley was representing Facebook and Millennial in these cases. De Angelo Supp. Decl. ¶3. Mr. De Angelo has always believed that he was personally represented by Cooley. De Angelo Supp. Decl. ¶3.

On February 6, 2013, Ms. Rebecca Buchanan, firm wide Director of Business Information Services and Conflicts, located at Cooley's San Francisco office, implemented an ethical screen that precluded attorneys in any patent litigation currently ongoing from communicating with, or providing information to, attorneys at Cooley who previously had an attorney-client relationship with Pattern Intelligence, Inc., Incandescent, Inc., or previously had contact with Mr. De Angelo. Buchanan Decl. ¶¶1, 2, 4.

On April 22, 2013, Pattern merged into Evolutionary pursuant to a merger agreement under Delaware law. De Angelo ¶19. The Merger Agreement provides that all rights and privileges of Pattern have been transferred to Evolutionary as the surviving company. De Angelo ¶19. The merger fulfilled a number of objectives, such as alleviating administrative burdens and increasing cost

19

savings with respect to Delaware's annual franchise taxes. De Angelo Supp. Decl. ¶1. On April 26, 2013, Incandescent assigned the '102 patent to Evolutionary. De Angelo Decl. ¶18.

## V. DISCUSSION

As noted above, there are different rules for conflicts of interest arising in concurrent and former representations. For conflicts involving former representations, the movant must prove either that the present and former matters are substantially related or that the former attorney actually possesses relevant confidential information. *In re Am. Airlines*, 972 F.2d at 615–16; *see also* ABA MODEL RULE 1.9; TEX. R. DISCIPLINARY P 1.09.

## A.    Whether the present and former matters are substantially related

Under the substantially related test, the movant must prove: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations. *In re Am. Airlines*, 972 F.2d at 614.

## 1.    Whether an actual attorney-client relationship exists

Generally, only a former or current client has standing to bring a motion to disqualify counsel based on a conflict of interest. *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976). The threshold question for the Court is whether Evolutionary has standing to assert the rights and privileges of Mr. De Angelo, Pattern, or Incandescent. For the question of standing to be properly addressed, the Court must first determine if an attorney-client relationship existed between Cooley and Mr. De Angelo, Pattern, or Incandescent.

a.    **Whether an attorney-client relationship existed between Mr. De Angelo and Cooley**

According to Evolutionary, Mr. De Angelo always believed that he was personally represented by Cooley. Evolutionary contends this belief is reasonable because Mr. De Angelo was Pattern's only shareholder, and he has always owned over 90% of both Incandescent and Evolutionary. Evolutionary relies on *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 454 (S.D.N.Y. 2001) to support its assertion that a client's reasonable belief they are consulting a lawyer and their manifested intention to seek professional legal advice will sway the court's analysis on whether an attorney-client relationship was created. However, this Court has held an individual's subjective belief alone is insufficient to establish the requisite relationship. *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1384 (10th Cir. 1994); *see also Mitchell Enters., Ltd. v. Bennie Consulting Eng's LLC*, No. 5:12-cv-110, at *6-7 (E.D. Tex. Jan. 22, 2013) (subjective belief regarding attorney-client relationship, even coupled with draft letter and telephone conversations, insufficient to establish attorney-client relationship). Here, Mr. De Angelo's subjective belief that he was personally represented by Cooley is not particularly reasonable nor is it dispositive.

The Court's analysis evaluates objective facts to determine whether parties have manifested their mutual intent to create an attorney-client relationship. The facts are as follows. According to Mr. Coll, Mr. De Angelo wanted to retain Cooley to assist with corporate structures and financing, but this relationship did not materialize. Mr. Coll understood that Irizen was a potential client of the firm (not Mr. De Angelo personally) and at one point hoped to develop the relationship into one of attorney-client, but they did not progress to that level. Mr. Coll's discussions with Mr. De Angelo never progressed to the point of discussing costs or Cooley's rates. Mr. Coll never sent Mr. De Angelo a proposed engagement letter. The only documents Mr. De Angelo provided Mr. Coll

contained information he intended Mr. Coll to distribute to potential investors and did not require a confidentiality agreement between any party. The advice Mr. Coll provided was written off as client development and was never billed to Mr. De Angelo.  After Mr. De Angelo sent Mr. Coll an email asking him to "put a hold on Irizen activities" and that Mr. De Angelo would be in touch with further information, Mr Coll no longer believed that Irizen was interested in engaging Cooley's services or developing an attorney-client relationship.

The work Cooley later performed for Pattern and Incandescent was limited to these two business entities, and Mr. De Angelo was repeatedly informed that Cooley did not and would not represent him individually. The engagement letters Ms. Bourdet sent Mr. De Angelo expressly stated "we [Cooley] are going to represent only the Company and will not be able to represent the founder's or other owner's interest (including your own interest as a founder of the Company) separately." Mr. De Angelo would not execute the first set of engagement letters because he refused to provide a retainer; however he was later notified that Cooley would represent Pattern and Incandescent without requiring a retainer if the scope of its representation was limited to non-patent work as Mr. De Angelo had indicated.  Several months later, Mr. De Angelo had his prior patent attorneys send their files of Pattern's patents portfolio to Ms. Bourdet.  After unexpectedly receiving the files, Ms. Bourdet reminded Mr. De Angelo that Cooley could not represent Pattern in patent matters without a retainer. Although Cooley had not agreed to take responsibility for any patent matters, Ms. Bourdet asked Mr. Galliani to determine whether there were any impending deadlines. Up to this point, Cooley mostly performed work related to Incandescent's corporate structure, finances, and document review. Cooley's representation of Pattern and Incandescent ended due to unpaid legal fees on April 28, 2008 when disengagement letters were mailed to both companies, and the patent files were

returned to Mr. De Angelo.

Notwithstanding Mr. De Angelo's statement that he "always believed that he personally was represented by Cooley," the facts in this case do not establish an intent by Cooley and Mr. De Angelo to form an attorney-client relationship.

### b.   Whether an attorney-client relationship existed between Cooley and Pattern and Incandescent

Cooley represented Pattern and Incandescent for a short period of time and provided legal services related to corporate structuring, corporate financing, and document review.   The facts include the following which are outlined in greater detail above.

- Following the execution of the engagement agreements, Mr. De Angelo asked Cooley to incorporate an entity to be known as Incandescent, Inc.  Bourdet Decl. ¶15.

- During 2007 and 2008, Cooly briefly assisted Incandescent with corporate work, filing articles of incorporation, reviewing licensing agreements, and providing advice acquiring financing. Bourdet Decl. ¶16.; De Angelo Decl. ¶11.

- From March through June 2007, Cooley prepared basic paperwork to incorporate Incandescent in Delaware and issue stock; engaged in high level review of the Executive Summary previously provided, which Mr. De Angelo revised to refer to Incandescent instead of Pattern Intelligence; and performed high level review of proposed license agreement and another document  for Incandescent. Bourdet Decl. ¶18-19.

- Mr. Galliani billed 1 hour of time addressing Incandescent's Executive Summary; his review of the pending patents and patent applications in connection with the Executive Summary was cursory and high level, and any advice he provided to Pattern or Incandescent regarding the Executive Summary was similarly cursory and high level.

- Mr. Galliani filed a non-provisional application leading up to the '102 patent. Galliani Decl. ¶10

- In total, Cooley billed Incandescent and Pattern for 26.85 hours of attorney time on both corporate and patent matters. Only 3.25 hours of that total were billed by Cooley attorneys to patent-prosecution work.  Bourdet Decl. ¶27.

23

- On April 28, 2008, Ms. Bourdet mailed disengagement letters to both Pattern Intelligence and Incandescent. Bourdet Decl. ¶29.

Given these facts, the Court concludes that Cooley did represent Pattern and Incandescent.

**c.    Whether Cooley's attorney-client relationship with Pattern and Incandescent was transferred to Evolutionary, giving Evolutionary standing to bring this motion**

In *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985), the Supreme Court stated that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id*. at 349. Several courts interpreting *Weintraub* have recognized "that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege." *American Int'l Specialty Lines Ins. Co. v. NWI-I, Inc*., 240 F.R.D. 401, 406 (N.D. Ill. 2007). However, "[a] transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *In re Grand Jury Subpoenas,* 734 F.Supp. at 1211 n. 3; *see also, NCL Corp. v. Lone Star Bldg. Ctrs., Inc.,* 144 B.R. at 174 (transfer of a lease did not transfer the attorney-client privilege); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 2003 WL 21911066 (N.D. Ill.2003) (sale of certain assets did not transfer the right to invoke the attorney-client privilege despite contract provision stating that the privilege transferred with the sale); *Pilates, Inc. v. Georgetown Bodyworks Deep Muscle Massage Ctrs., Inc.,* 201 F.R.D. 261 (D.D.C.2000) (assignee of trademarks had no right to assert the attorney-client privilege where there was no transfer of control of the corporation); *SMI Industries Canada, Ltd. v. Caelter Industries, Inc.,* 586 F.Supp. 808 (N.D.N.Y.1984) (assignment of trademarks and goodwill did not assign attorney-client privilege).

There is no bright-line rule regarding whether the attorney-client relationship is transferred

upon corporate restructuring.  Although it did not involve a merger, both parties have cited to this court's decision in *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760 (E.D. Tex. 2004) and dispute whether a transfer of assets from one corporation to another transfers the right to assert privilege.  In that case, defendant Amazon contended that plaintiff Soverain could not assert the privilege of predecessor entities Open Market, Inc. and Divine, Inc. (collectively, "Soverain predecessors"or "the predecessors"). *Id.* at 762. After the Soverain predecessors filed for bankruptcy, Soverain acquired a portion of its predecessors' assets, including the patents asserted in that case. When defendant moved to compel the predecessors' privileged documents, Soverain maintained that as a successor entity, it was entitled to assert the predecessors' attorney-client privilege. *Id.*

When resolving the dispute in *Soverain*, the court specifically noted that a transfer of some assets or a single patent from one corporation to another does not transfer the attorney-client privilege. *Soverain*, 340 F. Supp.2d at 763.  The court noted that a "bright-line rule does not apply equally to the myriad ways control of a corporation or a portion of corporation can change hands." *Id.* Therefore, the court found "the more appropriate rule to be 'whether the attorney-client relationship transfers ... to the new owners turns on the practical consequences rather than the formalities of the particular transaction.  According to the court:

> If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well.

*Id*.  But in *Soverain*, the evidence of record persuaded the court that Soverain assumed control of its predecessors' business following bankruptcy and the transfer of the patents to plaintiff ultimately amounted to more than a limited transfer of assets. *Id.*  Thus, the court found that control of the enterprise, and with it the right to assert the attorney-client privilege, passed to the plaintiff.  *Id.*

25

The facts surrounding the relevant transactions are as follows. Pattern assigned all of its intellectual property to Incandescent in June 2009. Evolutionary was formed as a wholly owned subsidiary of Incandescent in 2012. In July 2012, Incandescent assigned the patents-in-suit to Evolutionary. Pattern had to be revived March 18, 2013, and Pattern merged with Evolutionary on April 22, 2013. Incandescent assigned the '102 patent to Evolutionary on April 26, 2013. Evolutionary filed its current motion to disqualify on May 2, 2013, even though Cooley filed an unopposed application for an extension of time to answer the complaint on behalf of Facebook in early November 2012.

When Pattern merged with Evolutionary in April 2013, it had no meaningful corporate existence. Pattern had already assigned its intellectual property to Incandescent in 2009. In his supplemental declaration, Mr. De Angelo states the merger of Pattern *into Incandescent* fulfilled a number of objectives, such as alleviating administrative burdens and increasing cost savings with respect to Delaware's annual franchise taxes and cited Mr. De Angelo's supplemental declaration. Reply at *1. The Court notes the actual Merger Agreement is between Pattern and Evolutionary. Even though the Merger Agreement provides that all rights and privileges have been transferred to Evolutionary, as noted above, Pattern had no meaningful corporate existence at the time of the merger, having previously assigned all of its assets.

The Court finds the Pattern-Evolutionary merger lacked "practical consequences." *Soverain*, 340 F. Supp. 2d at 763. Not only did the merger occur a mere eleven days before the filing of this motion, but Pattern had to be revived on March 18, 2013 to effectuate the merger. Mr. De Angelo's statement regarding the objectives of the merger does not convince the Court that the practical consequences of the transaction resulted in the transfer of control of the business and the

continuation of the business under new management so that the authority to assert the attorney-client privilege should follow as well.  Evolutionary has failed to show that Cooley's former relationship with Pattern flows to Evolutionary.

Finally, the Court notes courts do not order disqualification when corporations employ tactical maneuvers to manufacture conflicts. *See Gould, Inc. v. Mitsui Mining & Melting Co.*, 738 F. Supp. 1121, 1127 (N.D. Ohio 1990) ("While not the situation in this case, it is clear that courts would not permit one party in a case to create a conflict which forces the disqualification or withdrawal of opposing counsel by buying up companies which opposing counsel represent."). According to Defendants' surreply, Evolutionary advised Cooley in late January that it perceived a conflict; Evolutionary further advised Cooley that it would file a motion to disqualify Cooley as soon as practicable.  However, it did not do so for several months. Defendants assert Evolutionary instead asked Cooley for Pattern and Incandescent's client files, revived Pattern, and merged Pattern with Evolutionary; only then did Evolutionary finally file its current motion in May. Given the facts, Defendants persuasively argue the recent merger was one "on paper only, engineered to create an alleged conflict where none existed, and should weigh against disqualification."  Resp. at pg. 5.

Turning to Cooley's former relationship with Incandescent as a basis for standing, Evolutionary relies on *Honeywell Int'l, Inc. v. Philips Lumileds Lighting Co.*, 2009 WL 256831 (E.D. Tex. 2009), asserting it should be treated as Cooley's client. "In the parent/subsidiary context, some of the key facts applicable to the analysis include (1) whether the corporation and the subsidiary share a common legal department and management duties, (2) whether the lawyer's work for a parent corporation benefits a subsidiary, or (3) whether the lawyer's work for the parent involves collecting confidential information." *Id.* at *2.  Here, Evolutionary states Mr. De Angelo is the sole manager

and director of Incandescent and Evolutionary; the companies share management; Mr. De Angelo has always directed the legal work of both companies; and Cooley's prior work on Incandescent's behalf benefits Evolutionary, who now owns the same patents.

Unlike this situation, the *Honeywell* case involved a current corporate client and a concurrent conflict of interest. Here, it is undisputed that Incandescent is a former Cooley client, not a current one, and the Court is not convinced the *Honeywell* factors apply. Regardless, courts have held that "representation adverse to a former client's affiliate is proper unless there is a high degree of operational commonality and financial dependence between the affiliated entities." *See GSI Commerce Solutions, Inc. v. BabyCenter LLC*, 618 F.3d 204, 210-11 (2d Cir. 2010). Other than Mr. De Angelo's common involvement, Evolutionary has not presented evidence of Evolutionary's operational commonality with or financial dependence on Incandescent.

The mere assignment of a patent does not transfer an attorney-client relationship. *See Telectronics Proprietary, LTD. v. Medtronic, Inc.*, 836 F.2d 1332, 1336 (Fed. Cir. 1988). A transfer of assets, without more, is not "sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *American Int'l*, 240 F.R.D. at 406. Evolutionary asserts all of Incandescent's assets (which had been assigned to Incandescent by Pattern) have been assigned to Incandescent's wholly owned subsidiary Evolutionary, and Evolutionary is a continuation of Pattern's business.

Defendants state there was no "transfer of control" and no "new management" between Incandescent and Evolutionary; thus Evolutionary did not inherit the right to assert the attorney-client privilege. The Court agrees. "Practically speaking, in this case there have been no managerial changes and the only transfer that has taken place has been the shift of certain patents from the parent

28

corporation [Incandescent] to subsidiary [Evolutionary]." *U.S. Eternet Innovations, LLC v. Acer, Inc.*, No. 6:09cv448 (E.D. Tex May 7, 2010). Similar to the situation in *U.S. Eternet*, there is no indication Incandescent ceased to exist or that it ceased managing its affairs.

In *In re Yarn Proc. Patent Valid. Litig,*, 530 F.2d 83, 89 (5th Cir. 1976), a case cited by Evolutionary, the court held a former client's "partner" and "joint venturer" who was assigned the former client's patent did not have standing to assert the former client's privileges. *Id.* at 90. The current patent owner had confused the nature of the rights implicit in the assignment of the patent with the nature of the rights which arise between an attorney and client. *Id.* The court stated the assignment of the patent did not assign the attorney-client relationship along with it, noting that the "relationship between an attorney and his client is personal." *Id.*

The Court, having carefully considered the evidence, is not convinced Cooley's attorney-client relationship with Pattern and Incandescent was transferred to Evolutionary upon corporate restructuring. Evolutionary has failed to carry its burden to establish standing.

However, the Court will assume for purposes of this Order that Evolutionary is able to assert the privilege shared between Incandescent/Pattern and Cooley. The Court will consider the second prong of the substantial relationship test.

**2.    Whether a substantial relationship exists between the subject matter of the former and present representations**

A substantial relationship may be found only after "the moving party delineates with specificity the subject matters, issues, and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent.*" In re American Airlines*, 972 F.2d at 614 (internal quotations omitted). Factors used in determining if the present and former matters are substantially related are (1) factual similarities

29

between the current and former representations; (2) the similarities between the legal question posed; and (3) the nature and extent of the attorney's involvement with the former representation.

Evolutionary claims a substantial relationship existed between Cooley's current and former representations based on: (1) Cooley's refiling of the non-provisional '102 patent application; (2) discussions between Mr. Galliani and Mr. De Angelo regarding infringement and invalidity of the '536 patent and the '682 application; and (3) Cooley's representation regarding monetization of the patents and their ownership structure.

Evolutionary claims that both representations involved the same technologies, patent specifications, and claim limitations. Mot. at 13. It bases this claim on two factual assertions: (1) Mr. De Angelo had privileged discussion with Mr. Coll and Mr. Galliani regarding the same intellectual property at issue in this litigation – the inventions and claims of the '536 patent and the planned '682 patent; and (2) Mr. Galliani's involvement in the prosecution of the '102 application involved facts common to this case "because the '102 patent was developed to facilitate interaction with containerized time and space information present in the patents-in-suit." Mot. at pgs. 13-14. According to Evolutionary, Mr. Galliani even filed a petition to withdraw as attorney of record for the '682 application, and he reviewed the '536 application and provided Mr. De Angelo and Pattern with advice regarding the scope of its claims. Evolutionary further asserts Cooley's involvement was significant, resulting in $13,000 of legal work. Finally, Evolutionary asserts Cooley gained knowledge of Mr. De Angelo's monetary objectives and the ownership structures of the patents, giving Defendants an unfair advantage with respect to reasonable royalty damages issues and settlement negotiations.

Cooley's patent work consisted of general advice and refiling an application for the '102

patent, which is not a patent-in-suit. Cooley prepared basic paperwork for incorporating Incandescent and issuing shares of stock and engaged in high level review of an Executive Summary to replace Pattern with Incandescent.  Of the 26.85 hours of attorney time Cooley billed, Cooley billed only 3.25 hours for patent prosecution work on the '102 patent. Cooley prepared and filed the non-provisional application leading to the '102 patent, however, the information used to file this application was taken from a previously filed provisional application.

The parties dispute whether the '102 application and the patents-in-suit involve the same subject matter. According to Cooley, the public patent record confirms the technology of the '102 patent is unrelated to the patents-in-suit.  During prosecution of the '102 application, the PTO observed that the application was drawn to "a radical based, concentric user interface" and to "dynamically generating menu items in a window based on a user selection."  Cole Decl. at 2. Although Evolutionary acknowledges the claims of the '102 patent do not reference containers and registers, being the "critical structures" in the asserted patents, Evolutionary states the '102 patent specification discusses them.  The patent claims, not the specification, define the scope of the patent. Unlike the patents-in-suit, the '102 patent claims a particular implementation of graphical user interface.  The fact the '102 specification may briefly discuss technical concepts in the same field as the patents-in-suit does not make them substantially related. *See, e.g.*, *Biax Corp. v. Fujitsu Computer Sys. Corp.*, 2007 WL 1466638 at *2 (E.D. Tex. May 16, 2007) (declining to find a substantial relationship where both representations involved server architecture); *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 WL 4376104 at *8 (E.D. Tex. Dec. 13, 2007) ("the sole presence of related subject matter does not establish a substantial relationship"). Moreover, Mr. Galliani did not draft any portion of the '102 application; he merely refiled an

31

existing application.

Evolutionary also asserts Mr. De Angelo and Mr. Galliani had a telephone conversation relating to the infringement and invalidity of the '536 patent and '632 application. The March 2007 conversation was "cursory and high level" and occurred before Cooley received Pattern's patent files so the only documents available to Mr. Galliani were publicly available patent files. According to Cooley, Incandescent's Executive Summary, which prompted the phone call, merely summarized those public documents. Mr. Galliani represents his advice was not substantially related to any infringement or invalidity issues that could arise in a patent litigation involving the '536 or '682 patents. *See* Galliani Decl. ¶ 4. Evolutionary has offered no explanation of how the alleged conversation or how Mr. Galliani's alleged advice regarding the Executive Summary for another company substantially relates to the issues in this case.

Evolutionary also argues Cooley participated in the prosecution of the '682 patent application, asserting Mr. Galliani sought to withdraw as attorney of record with the PTO. Mr. Galliani has explained that when he filed a notice of withdrawal as attorney of record before the PTO for the '102 application, he also mistakenly filed a notice of withdrawal as attorney of record for the '682 patent. The PTO rejected the notice because Mr. Galliani never appeared in the proceeding. The Court is not convinced Cooley performed substantive work on the '536 and '682 patents.

Lastly, Evolutionary asserts Defendants downplay the significance of Cooley's representation with respect to the monetization and the ownership structure of the patents. Once again, Evolutionary fails to provide any specificity to satisfy its burden. Evolutionary does not attempt to explain how any plan of former patent owners would be relevant to calculating a reasonable royalty, or how Pattern and Incandescent's monetization plan compares to Evolutionary's. According to Ms.

32

Bourdet, at no time during the prior representations did either Pattern or Incandescent discuss with Cooley any plan to use its patents as a sword against entities that are not its competitors. Supp. Bourdet Decl. ¶ 2. The Court is also not convinced the patent ownership structure of Pattern and Incandescent bears a relationship to Cooley's current representations.

Evolutionary has failed to satisfy its burden of showing a substantial relationship exists between the subject matter of the former and present representations.

**B.    Whether the former attorney actually possess relevant confidential information**

Evolutionary also argues Cooley should be disqualified because it received allegedly confidential information. Even when matters are not substantially related, a former client may still disqualify former counsel by showing that confidential information was provided to counsel and that the confidential information is relevant to the new matter. Again, the Court's analysis begins with whether Evolutionary is properly considered a former client of Cooley. The Court has previously concluded that Pattern's and Incandescent's former relationship with Cooley does not flow to Evolutionary; thus Evolutionary is not a former client. However, for purposes of this discussion, the Court will assume Evolutionary has made a showing that would justify transferring any former attorney-client relationship with Cooley to Evolutionary. The Court now considers whether Evolutionary has shown Cooley possesses relevant confidential information in the manner contemplated by Texas Rule of Professional Conduct Rule 1.09.

In discussing Rule 1.09, the Fifth Circuit Court of Appeals has noted that Rule 1.09(a)(2) incorporates Rule 1.05, which prohibits a lawyer's use of confidential information obtained from a former client to that former client's disadvantage. *In re American Airlines*, 972 F.2d 605, 615 (5th Cir. 1992). According to the Fifth Circuit, Rule 1.09 "forbids a lawyer to appear against a former

33

client if the current representation in reasonable probability will involve the use of confidential information *or* if the current matter is substantially related to the matters in which the lawyer has represented the former client." *Id*. (emphasis in original).

Thus, Defendants assert ethical issues are implicated only if there is a "reasonable probability" that the former attorney will use confidential information previously obtained from a client against that client. TEX. R. DISCIPLINARY P. 1.09(a)(2). According to Defendants, mere receipt of any type of confidential information is not enough.  Evolutionary takes issue with Defendants' assertion that there has to be a "reasonable probability" that the attorney may use confidential information previously obtained from a client against that client.  As noted above, however, in *In re American Airlines*, the court explained: "a former client could also disqualify counsel by showing that his former attorney possessed relevant confidential information in the manner contemplated by Rule 1.09(a)(2)." 972 F.2d at 615 (emphasis added). Under Rule 1.09(a)(2), disqualification is appropriate only "if the representation in reasonable probability will involve a violation of Rule 1.05." *Id.* Rule 1.05, in turn, prohibits *using* confidential information to a former client's detriment. *Id.*

Evolutionary identifies three categories of purportedly confidential relevant documents that it claims Cooley received: (1) patent files, which Evolutionary claims include correspondence regarding the scope of the '536 patent and prior art; (2) the Irizen Executive Summary; and (3) and the Incandescent Executive Summary.  The only information identified by Evolutionary that may be relevant to the issues involved in this case is correspondence regarding the '536 patent and prior art.[2]

---

[2] The Court is not convinced the other described information contained in the files is relevant to this case and/or confidential. The '102 patent is in a different family from the ones being litigated in this case, and the Court is not persuaded the Executive Summaries disclose

Defendants do not deny that Cooley received Pattern's patent file from its former prosecution counsel. However, Defendants assert there is no risk that any of this information may used to Evolutionary's detriment in this case. The Court agrees.

While at one time the Cooley firm may have had access to confidential information, the work done by Cooley was limited, with only 3.25 hours billed for patent-prosecution work. According to Ms. Bourdet, Cooley was not expecting to receive the files when they arrived. Bourdet Decl. ¶20. Upon receiving the files in June 2007, Ms. Bourdet reminded Mr. De Angelo by email that Cooley could not represent Pattern in patent matters without a retainer. *Id.* at ¶21. On May 7, 2008, Ms. Bourdet directed that patent files be returned to Pattern. The files were returned to Pattern, and Cooley did not retain a copy. Mr. Galliani states he was never asked, nor did he perform, any work directed to either patent-in-suit, including the '532 patent. Galliani Decl. ¶16.

The Court finds no evidence that an attorney at Cooley actually reviewed any information that has bearing on this case. Mr. Galliani represents he has no recollection of seeing any correspondence between Pattern, Incandescent, or Mr. De Angelo and the law firm of Fish & Richardson. *Id.* at ¶17. Mr. Galliani and Ms. Bourdet state they have shared no confidential information regarding Pattern, Incandescent, or Mr. De Angelo with the attorneys who represent Facebook or Millennial Media in this litigation.

Cooley has implemented an ethical screen that precludes attorneys in any patent litigation

---

confidential information. Although the summaries identify the patents and generally describe their subject matter, this information is publicly available, not confidential. Mr. De Angelo provided Mr. Cooley with the Executive Summaries for the very purpose of sharing them with potential investors. *See* Coll Decl., ¶¶ 3-9, 12-13. Disclosing information for the purpose of it being shared with a third party is inherently non- confidential. *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454-55 (2002) (disclosing confidential information to anyone not bound to keep it in confidence renders it generally known, stripping it of confidentiality).

currently ongoing from communicating with, or providing information to, attorneys at Cooley who previously had an attorney-client relationship with Pattern Intelligence, Inc., Incandescent, Inc., or previously had contact with Mr. De Angelo. Buchanan Decl. ¶¶1, 2, 4. Considering walls have been erected at Cooley to preclude any possible confidential information from being shared and further considering the very limited nature of Cooley's former patent work and its minimal relevance to this case, Evolutionary has failed to show a reasonable probability that the claimed confidential information may be used against it.

Evolutionary has also failed to clearly identify the nature and content of the correspondence as related to claim interpretation and prior art. "While [the movant] is not required to produce the actual confidential information, it has the burden to delineate with specificity what confidential information was shared." *Soverain*, 2010 WL 1038731 at *4. Again, Mr. Galliani does not recall seeing correspondence between Mr. De Angelo and his prior patent attorneys at Fish and Richardson. Galliani Decl. ¶¶ 16, 17, 19. Finally, Cooley returned Pattern's patent files in May 2008 and did not retain a copy. Bourdet Decl., ¶ 31. Mr. Galliani reviewed the patent files to determine any impending deadlines (normal operating procedure for the firm).

In sum, the Court is not convinced Cooley possesses relevant confidential information. Nor is the Court convinced there is a reasonable probability Cooley may use any confidential information that was briefly in the possession of other Cooley attorneys over five years ago to Evolutionary's detriment.

**C.    Whether equitable considerations support disqualification**

In considering disqualification of counsel for conflicts of interest, courts balance the ethical rules and the social interests at stake. *U.S. Fire Ins. Co.*, 50 F.3d at 1314. Courts in this circuit view

"ABA and state rules and standards in light of the litigant's rights and the public interest, considering whether a conflict has the appearance of impropriety in general, or a possibility that a specific impropriety will occur, and the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *Hill*, 2008 WL 4108120 at *2.

Even if the Court were to assume that Cooley's past access to Pattern's files did create a conflict of interest here, disqualification would not be warranted under the Fifth Circuit's balancing test. Cooley represented Incandescent and Pattern on unrelated matters over five years ago. This does not have the appearance of impropriety, and there is little risk that any impropriety will occur. *See JuxtaComm-Texas*, 2010 WL 4920909 at *6.

Disqualification is a drastic remedy, and the Court is sensitive to the fact that the Cooley firm had already been representing Defendants for six months when the motion to disqualify was filed. Limited discovery and a lengthy motion practice regarding venue has already occurred in this case. *See Federal-Mogul World Wide, Inc. v. Mahle GMBH*, 2012 WL 834459, *4 (E.D. Mich. 2012)(unreported). Facebook and Millennial Media (along with the other defendants) have filed motions to transfer venue. The Court denied Facebook's motion to stay its case pending resolution of its transfer motion and allowed Plaintiff time to conduct venue-related discovery before being required to respond to the defendants' motions to transfer. Those motions are now ripe for consideration.

The possibility of public suspicion is outweighed by Defendants' interest in Cooley's continued representation. *Id.* at *7. "To disqualify [Cooley] at this point would create a significant hardship for the defendants." *Federal-Mogul*, 2012 WL 834459 at *4. To force Defendants to obtain

new counsel would increase Defendants' expense and severely prejudice them. *JuxtaComm-Texas*, 2010 WL 4920909 at *6.

For all of these reasons, the Court **DENIES** Plaintiff's Emergency Opposed Motion to Disqualify Cooley LLP as Counsel of Record for Facebook, Inc. and Millennial Media, Inc. (Docket Entry #s 50, 35).

**SIGNED this 3rd day of July, 2013.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE